1   C. Mark Whitehead, III (Bar No. 27682)
    The Whitehead Law Firm, L.L.C.
2   Post Office Box 81007
3   Lafayette, LA 70598
    337 740-6006 Telephone
4   337 740-6002 Facsimile

5   Attorney for Plaintiffs

6

7

8                   UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     (SAN FRANCISCO DIVISION)

11

12   OLLIE AND ALICE STEWART, ET AL      Case No. _____

13              Plaintiffs,             **CIVIL COMPLAINT**

14   v.                                                      **CRB**

15   PFIZER INC., PHARMACIA              **JURY TRIAL DEMANDED**
     CORPORATION, and G.D. SEARLE, LLC,
16
              Defendants.
17

18         OLLIE and ALICE STEWART (hereinafter referred to as "Plaintiff Stewart");  JANICE
19
     and THOMAS KAELIN (hereinafter referred to as "Plaintiff Kaelin"); ELSIE SISTRUNK
20
     (hereinafter referred to as "Plaintiff Sistrunk"); and BETSY and HORACE YARBROUGH
21
22   (hereinafter referred to as "Plaintiff Yarbrough") through counsel, bring this action against

23   Defendants PFIZER INC., PHARMACIA CORPORATION, and G.D. SEARLE, LLC (hereafter

24   collectively "Defendants") and alleges as follows:

25

26

27

28

I. **PARTIES**

1. This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib, trade name Bextra®.

2. Plaintiff STEWART is an individual who is a citizen of the state of Mississippi, and a resident of Leake County, Mississippi.

3. Plaintiff KAELIN is an individual who is a citizen of the state of Mississippi, and a resident of Hinds County, Mississippi.

4. Plaintiff SISTRUNK is an individual who is a citizen of the state of Mississippi, and a resident of Leake County, Mississippi.

5. Plaintiff YARBROUGH is an individual who is a citizen of the state of Mississippi, and a resident of Madison County, Mississippi.

6. Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York, New York. In 2003, Pfizer acquired Pharmacia Corporation for nearly \$60 billion. At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name BEXTRA® in California, Mississippi, Illinois and nationwide.

7. Defendant G. D. Searle, LLC, formerly known as G. D. Searle & Co. ("Searle") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Searle has been engaged in the business of marketing and selling BEXTRA® nationwide and in California, Mississippi and Illinois. Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

8. Defendant Pharmacia Corporation ("Pharmacia ") is a Delaware corporation with its principal place of business in New Jersey. At all relevant times, Pharmacia, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing,

- 2 -

1  packaging, marketing, distributing, promoting, and selling BEXTRA® nationwide and in
2  California, Michigan and Illinois.

3  **II.   JURISDICTION AND VENUE**

4          9.      This is an action for damages, which exceeds seventy-five thousand dollars
5  ($75,000.00).

6          10.     There is complete diversity of citizenship between the Plaintiffs and
7  Defendants. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. §
8  1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because
9  there is complete diversity of citizenship between Plaintiffs and Defendants.

10         11.     Venue is proper in this United States Judicial District pursuant to 28
11 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in the
12 district, thereby receiving substantial financial benefit and profits the dangerous product in this
13 district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper.

14         12.     At all relevant times herein, Defendants were in the business of designing,
15 manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and
16 selling their product, BEXTRA®. Defendants at all times relevant hereto designed, developed,
17 manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce
18 (including California and Michigan) the aforementioned prescription drug.    Defendants do
19 substantial business in the State of California and within this Federal Judicial District, advertise in
20 this district, receive substantial compensation and profits from sales of BEXTRA® in this District,
21 and made material omissions and misrepresentations and breaches of warranties in this District so
22 as to subject them to *in personam* jurisdiction in this District. In engaging in the conduct alleged
23 herein each defendant acted as the agent for each of the other defendants, or those defendant's
24 predecessors in interest.

25 **III.   INTERDISTRICT ASSIGNMENT**

26         13.     Assignment to the San Francisco Division is proper as this action is related
27 to *In Re: Bextra® and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to
28

1  the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,
2  2005.

3  **IV.    FACTUAL BACKGROUND**

4      **A.    Facts Regarding Plaintiff's**

5

6          14.    Plaintiff STEWART ingested BEXTRA® as prescribed from approximately
7  June 2004 until approximately November 2004.  As a result of taking BEXTRA®, Plaintiff
8  suffered a Myocardial Infarction in October of 2004.

9          15.    Plaintiff KAELIN ingested BEXTRA® as prescribed from approximately
10 August 1, 2002 until September 27, 2004.  As a result of taking BEXTRA®, Plaintiff suffered a
11 Myocardial Infarction on January 3, 2003.

12         16.    Plaintiff SISTRUNK ingested BEXTRA® as prescribed from approximately
13 2003 until April of 2005.  As a result of taking BEXTRA®, Plaintiff suffered a Myocardial
14 Infarction on April 18, 2005.

15         17.    Plaintiff  YARBROUGH  ingested  BEXTRA®  as  prescribed  from
16 approximately 2002 until January of 2004.  As a result of taking BEXTRA®, Plaintiff suffered a
17 Stroke in January of 2004.

18         18.    Plaintiffs  STEWART,  KAELIN,  SISTRUNK  AND  YARBROUGH's
19 healthcare providers could not have reasonably known or have learned through reasonable
20 diligence that such injury directly resulted from Defendants' negligent and otherwise culpable acts,
21 omissions, and misrepresentations or from Plaintiffs ingestion of BEXTRA®.

22         19.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH used
23 BEXTRA® in a proper and reasonably foreseeable manner and used it in a condition that was
24 substantially the same as the condition in which it was manufactured and sold.

25         20.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH would
26 not have used BEXTRA® had Defendants properly disclosed the risks associated with the drug.

27

28

**B.    Facts Regarding Bextra® and Bextra's Market Launch**

21.    Bextra® is one of a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

22.    NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cycloxygenase or "COX." There are two forms of COX enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

23.    In addition to decreasing inflammation, the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

24.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a potent platelet aggregator and vasoconstrictor, which is synthesized by platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

25.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

26.    Defendants and other pharmaceutical companies set out to remedy these ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue while still reducing inflammation.

- 5 -

1    27.    In making this decision, Defendants and their predecessors in interest either

2  intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2

3  inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood

4  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,

5  unstable angina. The vasoconstriction and fluid retention cause the hypertension.

6    28.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs,

7  in early 1999 and initiated a massive marketing campaign to convince doctors and consumers of

8  the superiority of their new "blockbuster" drug over less inexpensive NSAIDs.  In May 1999,

9  Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

10    29.    Seeking increased market share in this extremely lucrative market,

11  Defendants, and their predecessors in interest, also sought approval of a "second generation"

12  selective COX-2 inhibitor and filed for FDA approval of Bextra® on January 16, 2001 for the

13  (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief

14  of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

15    30.    The FDA granted approval of the new drug on November 16, 2001, for two

16  particular uses:  (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

17  of osteoarthritis and rheumatoid arthritis.

18    31.    The FDA did not grant approval to market and promote Bextra® for the

19  management or prevention of acute pain.

20    32.    The FDA did not grant approval to promote Bextra® as more effective than

21  other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or

22  gastric bleeding.

23    33.    Even without a label that allowed Defendants to legitimately claim superior

24  safety, when Defendants, and their predecessors-in-interest, began marketing Bextra® in early

25  2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra®

26  to consumers, including Plaintiff, the medical community, healthcare providers, and third party

27  payers.  Defendants proceeded to promote, market, sell, and distribute Bextra® as a much safer

28  and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

1

      **C.**    **Facts Regarding Bextra®'s Safety and Defendants' Knowledge Thereof.**

2          34.    The potential for cardiovascular risk of selective COX-2 inhibitors was

3 known to Defendants long before the FDA granted market approval in November 2, 2001. By

4 1997, and prior to the submission of the New Drug Application (the "NDA") for Bextra®,

5 Defendants was aware that, by inhibiting COX-2, Bextra® altered the homeostatic balance

6 between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects

7 of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of*

8 *Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.

9 Although all COX-2 inhibitors have this mechanism of action, Bextra® was the most selective

10 COX-2 inhibitor proposed for approval. Accordingly, it had the greatest potential to cause adverse

11 cardiovascular and cerebrovascular events.

12         35.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of

13 Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on

14 October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as

15 Bextra®, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet

16 aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

17         36.    Nevertheless, on January 16, 2001, Defendants submitted an NDA to the

18 FDA for Bextra®, omitting information about the extent of the risks associated with Bextra®.

19 Without a complete picture of the potential hazards associated with the drug, the FDA approved

20 Bextra® on or about November 16, 2001.

21         37.    Based on the studies performed on Celebrex, Vioxx, Bextra®, and other

22 COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely

23 conducted, Defendants knew when Bextra® was being developed and tested that selective COX-2

24 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific

25 additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies show

26 that selective COX-2 inhibitors, including Bextra®, decrease blood levels of a prostacyclin. When

27 those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and

28 stroke.

1        38.     On December 9, 2004, the FDA issued new information on side effects
2   associated with the use of Bextra® and required the addition of certain warnings to, and the
3   strengthening of other warnings on, the Bextra® label. The enhanced warnings followed in the
4   wake of the results of additional cardiovascular studies performed by Defendants, as well as
5   numerous complaints to the FDA regarding severe skin reactions.

6        39.     Yet well prior to this warning, Defendants had knowledge of the coronary
7   and cardiovascular safety risks of Bextra® from several studies. *See e.g.*, Otto, E.O., *Efficacy and*
8   *Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing*
9   *Coronary Artery Bypass Surgery, The Journal of Thoracic and Cardiovascular Surgery*, June 2003
10  at 1481.

11       40.     Even Defendants' own (and Pfizer funded) post- drug approval meta-
12  analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data
13  showing an increased cardiovascular risk in patients treated with Bextra® after undergoing
14  coronary artery bypass graft surgery. Observed events included heart attack, stroke, and blood
15  clots in the legs and lungs. The results were particularly relevant and striking as each of the study
16  participants who were a post-bypass surgery patient was taking anti-clotting agents at the time their
17  exposure to Bextra® was being tracked.

18       41.     In mid-January 2005, a peer-reviewed paper from the University of
19  Pennsylvania found that in patients having heart bypass surgery, those who took Bextra® in the
20  intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a heart
21  attack or stroke.

22       42.     From February 16-18, 2005, the FDA's Drug Safety and Risk Management
23  Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine
24  the safety of COX-2 inhibitors. There, FDA Office of Drug Safety Officer David Graham testified
25  that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at about the
26  same rate as cigarette smoking, hypertension, and diabetes.

27       43.     Despite years of studies on selective COX-2 inhibitors, as well as the
28  disturbing new studies specifically analyzing the risks of Bextra®, Defendants failed to take any

- 8 -

1  action to protect the health and welfare of patients, but instead, continued to promote the drug for

2  sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis

3  Drug Advisory Committee meetings.

4        44.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily

5  withdraw" Bextra® from the U.S. market, stating:

6            ". . . the Agency has concluded that the overall risk versus benefit
            profile of Bextra® is unfavorable. This conclusion is based on the
7            potential increased risk for serious cardiovascular (CV) adverse
            events, which appears to be a class effect of non-steroidal anti-
8            inflammatory drugs (NSAIDs) (excluding aspirin), an increased
            risk of serious skin reactions (e.g. toxic epidermal necrolysis,
9            Stevens-Johnson syndrome, erythema multiforme) compared to
            other NSAIDs, and the fact that Bextra® has not been shown to
10           offer any unique advantage over the other available NSAIDs."

11        45.    FDA Alert for Healthcare Professionals, April 7, 2005.

12  Continuing, the FDA noted:

13           "Bextra® has been demonstrated to be associated with an
            increased risk of serious adverse CV events in two short-term trials
14           in patients immediately post-operative from coronary artery bypass
            graft (CABG) surgery . . . . FDA has concluded that it is reasonable
15           to extrapolate the adverse CV risk information for Bextra® from
            the short-term CABG trials to chronic use given the fact that other
16           COX-2 selective NSAIDs have been shown in long-term controlled
            clinical trials to be associated with an increased risk of serious
17           adverse CV events (e.g., death, MI, stroke), and the well described
            risk of serious, and often life-threatening gastrointestinal
18           bleeding . . . . To date, there have been no studies that demonstrate
            an advantage of Bextra® over other NSAIDs that might offset the
19           concern about the[] serous skin risks, such as studies that show a GI
            safety benefit, better efficacy compared to other products, or
20           efficacy in a setting of patients who are refractory to treatment with
            other products."
21
          46.    The scientific data available during and after Bextra®'s approval process
22
  made clear to Defendants that their formulation of Bextra® would cause a higher risk of blood
23
  clots, stroke and/or myocardial infarctions among Bextra® consumers, alerting them to the need to
24
  do additional and adequate safety studies.
25
          47.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of*
26
  *Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to
27
  humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and
28

- 9 -

1    benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established
2    coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and
3    have the highest risk of further cardiovascular events."

4        48.    Dr. Topol was also the author on the study published in August 2001 in
5    JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons
6    who used COX-2 inhibitors.

7        49.    Based upon readily available scientific data, Defendants knew, or should
8    have known, that their pre-approval testing of Bextra® did not adequately represent the cross-
9    section of individuals who were intended consumers and therefore, likely to take Bextra®.
10   Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for
11   Bextra® (noting that: "**Platelets**: In four clinical studies with young and elderly (>/=65 years)
12   subjects, single and multiple doses up to 7 day mg BID had no effect on platelet aggregation").

13       50.    Had Defendants done adequate testing prior to approval and "market
14   launch," rather than the extremely short duration studies done on the small size patient base that
15   was actually done) Pharmacia and Searle's scientific data would have revealed significant
16   increases in incidence of strokes and myocardial infarctions among the intended and targeted
17   population of Bextra® consumers. Adequate testing would have shown that Bextra® possessed
18   serious side effects for individuals such as Plaintiffs. Defendants should have taken appropriate
19   measures to ensure that their defectively designed product would not be placed in the stream of
20   commerce and/or should have provided full and proper warnings accurately and fully reflecting the
21   scope and severity of symptoms of those side effects should have been made.

22       51.    In fact, post-market approval data did reveal increased risks of clotting,
23   stroke and myocardial infarction, but this information was intentionally suppressed by Defendants
24   in order for them to gain significant profits from continued Bextra® sales.

25       52.    Defendants' failure to conduct adequate testing and/or additional testing
26   prior to "market launch" was based upon their desire to generate maximum financial gains for
27   themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
28   inhibitor market.

- 10 -

1    53.    At the time Defendants manufactured, advertised, and distributed Bextra®

2 to consumers, Defendants intentionally or recklessly ignored and/or withheld information

3 regarding the increased risks of hypertension, stroke and/or myocardial infarctions because

4 Defendants knew that if such increased risks were disclosed, consumers such as Plaintiffs would

5 not purchase Bextra®, but instead would purchase other cheaper and safer NSAIDs.

6    **D.    Facts Regarding Defendants' Marketing and Sale of Bextra®**

7    54.    Plaintiffs and at all times relevant herein, Defendants engaged in a

8 marketing campaign with the intent that consumers would perceive Bextra® as a safer and better

9 drug than its other NSAIDs and, therefore, purchase Bextra®.

10    55.    Defendants widely and successfully marketed Bextra® throughout the

11 United States by, among other things, conducting promotional campaigns that misrepresented the

12 efficacy of Bextra® in order to induce a widespread use and consumption.    Bextra® was

13 represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.

14 Defendants made misrepresentations by means of media advertisements, and statements contained

15 in sales literature provided to Plaintiff's prescribing physicians.

16    56.    Despite knowledge of the dangers presented by Bextra®, Defendants and

17 Defendants' predecessors in interest, through their officers, directors and managing agents for the

18 purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy

19 the known defects of Defendants' product, Bextra®, and failed to warn the public, including

20 Plaintiffs, of the serious risk of injury occasioned by the defects inherent in Defendants' product,

21 Bextra®®.    Defendants and their officers, agents and managers intentionally proceeded with the

22 inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,

23 Bextra®, knowing that persons would be exposed to serious potential danger, in order to advance

24 their own pecuniary interests.    Defendants' conduct was wanton and willful, and displayed a

25 conscious disregard for the safety of the public and particularly of Plaintiffs.

26    57.    In an elaborate and sophisticated manner, Defendants aggressively marketed

27 Bextra® directly to consumers and medical professionals (including physicians and leading

28 medical scholars) in order to leverage pressure on third party payers, medical care organizations,

1 and large institutional buyers (*e.g.*, hospitals) to include Bextra® on their formularies. Faced with
2 the increased demand for the drug by consumers and health care professionals that resulted from
3 Defendants' successful advertising and marketing blitz, third party payers were compelled to add
4 Bextra® to their formularies. Defendants' marketing campaign specifically targeted third party
5 payers, physicians, and consumers, and was designed to convince them of both the therapeutic and
6 economic value of Bextra®.

7          58.    Defendants represented that Bextra® was similar to ibuprofen and naproxen
8 but was superior because it lacked any of the common gastrointestinal adverse side effects
9 associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance,
10 NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-
11 term use. Defendants promoted Bextra® as a safe and effective alternative that would not have the
12 same deleterious and painful impact on the gut, but that would be just as effective, if not more so,
13 for pain relief.

14          59.    Bextra® possessed dangerous and concealed or undisclosed side effects,
15 including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina,
16 cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes.
17 In addition, Bextra® was no more effective than traditional and less expensive NSAIDs and, just
18 like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding.
19 Defendants chose not to warn about these risks and dangers.

20          60.    Defendants knew of these risks before the U.S. Food and Drug
21 Administration (the "FDA") approved Bextra® for sale on November 16, 2001, but Defendants
22 ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied
23 inefficacy in its promotion, advertising, marketing, and sale of Bextra®. Defendants' omission,
24 suppression, and concealment of this important information enabled Bextra® to be sold to, and
25 purchased, or paid for by, the Consumers at a grossly inflated price.

26          61.    Consequently, Bextra® captured a large market share of anti-inflammatory
27 drugs prescribed for and used by patients. In 2002 alone (after a drug launch in March of 2002),

28

1    sales of Bextra® exceeded $1.5 billion, despite the significantly higher cost of Bextra® as
2    compared to other pain relievers in the same family of drugs.

3              62.    It was not until April 7, 2005, that Defendants finally acknowledged
4    Bextra®'s deleterious side effects and announced that they were withdrawing the drug from the
5    worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking
6    Bextra® to an increased risk of heart attacks and strokes.

7              63.    Had Defendants done adequate testing prior to approval and "market
8    launch," Pharmacia's scientific data would have revealed significant increases in stroke and
9    myocardial infarction amongst the intended population of Bextra® consumers.  Adequate testing
10   would have shown that Bextra® possessed serious side effects.  Defendants should have taken
11   appropriate measures to ensure that their defectively designed product would not be placed in the
12   stream of commerce and/or should have provided full and proper warnings accurately and fully
13   reflecting the scope and severity of symptoms of those side effects should have been made.

14             64.    In fact, post-market approval data did reveal increased risks of clotting,
15   stroke and myocardial infarction, but this information was intentionally suppressed by Defendants
16   in order for them to gain significant profits from continued Bextra® sales.

17             65.    Defendants' failure to conduct adequate testing and/or additional testing
18   prior to "market launch" was based upon their desire to generate maximum financial gains for
19   themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
20   inhibitor market.

21             66.    At the time Defendants manufactured, advertising, and distributed Bextra®
22   to consumers, Defendants intentionally or recklessly ignored and/or withheld information
23   regarding the increased risks of hypertension, stroke and/or myocardial infarctions because
24   Defendants knew that if such increased risks were disclosed, consumers such as plaintiff would not
25   purchase Bextra®, but instead would purchase other cheaper and safer NSAID drugs.

26             67.    At all times relevant herein, Defendants engaged in a marketing campaign
27   with the intent that consumers, including plaintiff, and their doctors would perceive Bextra® as a
28   better drug than its competitors and, therefore, purchase Bextra®.

1       68.     Defendants widely and successfully marketed Bextra® throughout the

2    United States by, among other things, conducting promotional campaigns that misrepresented the

3    efficacy of Bextra® in order to induce a widespread use and consumption.    Bextra® was

4    represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.

5    Defendants made misrepresentations by means of media advertisements, and statements contained

6    in sales literature provided to Plaintiffs prescribing physicians.

7       69.     Prior to manufacturing, sale and distribution of Bextra®, Defendants,

8    through their officers, director and managing agents, had notice and knowledge from several

9    sources, that Bextra® presented substantial and unreasonable risks of harm to the consumer. As

10   such, Bextra® consumers, including Plaintiffs, were unreasonably subject to risk of injury or death

11   from the consumption of Defendants' product, Bextra®. Despite such knowledge, Defendants and

12   Defendants' predecessors in interest, through their officers, directors and managing agents for the

13   purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy

14   the known defects of Defendants' product, Bextra®, and failed to warn the public, including

15   Plaintiffs, of the serious risk of injury occasioned by the defects inherent in Defendants' product,

16   Bextra®.  Defendants and their officers, agents and managers intentionally proceeded with the

17   inadequate testing, and then the manufacturing, sale and marketing of Defendants' product,

18   Bextra®, knowing that persons would be exposed to serious potential danger, in order to advance

19   their own pecuniary interests.    Defendants' conduct was wanton and willful, and displayed a

20   conscious disregard for the safety of the public and particularly of Plaintiffs.

21

22                                    **CLAIMS FOR RELIEF**

23                               **FIRST CLAIM FOR RELIEF:**
                                        **Negligence**

24       70.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as

25   if fully set forth herein.

26       71.     Defendants owed Plaintiffs STEWART, KAELIN, SISTRUNK AND

27   YARBROUGH a duty to exercise reasonable care when designing, manufacturing, marketing,

28   advertising, distributing, and selling Bextra®.  This duty included the duty not to introduce a

                                        - 14 -

1    pharmaceutical drug, such as Bextra®, into the stream of commerce that caused users to suffer
2    from unreasonable, dangerous or untoward adverse side effects.

3            72.    At all relevant times to this action, Defendants owed a duty to properly warn
4    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH and the Public of the risks,
5    dangers and adverse side effects of their pharmaceutical drug Bextra®.

6            73.    Defendants breached their duties by failing to exercise ordinary care in the
7    preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing,
8    promotion, advertising and selling of Bextra®, including:

9                    a.    failing to use due care in the preparation and development of
10    Bextra® to prevent the aforementioned risk of injuries to individuals when the drugs were
11    ingested;

12                   b.    failing to use due care in the design of Bextra® to prevent the
13    aforementioned risk of injuries to individuals when the drugs were ingested;

14                   c.    failing to conduct adequate pre-clinical testing and research to
15    determine the safety of Bextra®;

16                   d.    failing to conduct adequate post-marketing surveillance and
17    exposure studies to determine the safety of Bextra®;

18                   e.    failing to completely, accurately and in a timely fashion, disclose
19    the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiffs
20    STEWART, KAELIN, SISTRUNK AND YARBROUGH, consumers, the medical community,
21    and the FDA;

22                   f.    failing to accompany Bextra® with proper warnings regarding all
23    possible adverse side effects associated with the use of Bextra®;

24                   g.    failing to use due care in the manufacture, inspection, and labeling
25    of BEXTRA® to prevent the aforementioned risk of injuries to individuals who used Bextra®;

26                   h.    failing to use due care in the promotion of Bextra® to prevent the
27    aforementioned risk of injuries to individuals when the drugs were ingested;

28

- 15 -

1      i.  failing to use due care in the sale and marketing of Bextra® to

2 prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

3      j.  failing to use due care in the selling of Bextra® to prevent the

4 aforementioned risk of injuries to individuals when the drugs were ingested;

5      k.  failing to provide adequate and accurate training and information to

6 the sales representatives who sold Bextra®;

7      l.  failing to provide adequate and accurate training and information to

8 healthcare providers for the appropriate use of Bextra®; and

9      m.  being otherwise reckless, careless and/or negligent.

10    74.  Despite the fact that Defendants knew or should have known that Bextra®

11 caused unreasonable and dangerous side effects which many users would be unable to remedy by

12 any means, Defendants continued to promote and market Bextra® to consumers, including

13 Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH, when safer and more

14 effective methods of pain relief were available.

15    75.  Defendants were, or should have been, had they exercised reasonable care,

16 in possession of evidence demonstrating that Bextra® caused serious side effects. Nevertheless,

17 they continued to market their products by providing false and misleading information with regard

18 to the safety and efficacy of Bextra®.

19    76.  Defendants knew or should have known that consumers such as Plaintiffs

20 STEWART, KAELIN, SISTRUNK AND YARBROUGH would foreseeably suffer injury as a

21 result of their failure to exercise ordinary care as described above.

22    77.  As a direct and proximate consequence of Defendants' acts, omissions, and

23 misrepresentations described herein, the Plaintiff and wife suffered loss of support and services

24 and endured mental pain and suffering and loss of consortium of her husband. The losses are

25 permanent and continuing in nature. Plaintiffs STEWART, KAELIN, SISTRUNK AND

26 YARBROUGH required healthcare and services incurring direct medical losses and costs

27 including care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

28

1    78.    Defendants' conduct was committed with knowing, conscious, wanton,
2  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
3  including Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH, thereby entitling
4  Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from
5  similar conduct in the future.

6    79.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
7  compensatory damages, and exemplary and punitive damages together with interest, the costs of
8  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

9
10    **SECOND CLAIM FOR RELIEF:**
    **Strict Liability**

11    80.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint
12  as if fully set forth herein and further alleged as follows:

13    81.    At all times relevant to this action, Defendants were suppliers of
14  BEXTRA®, placing the drug into the stream of commerce. BEXTRA® was expected to and did
15  reach Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH without substantial
16  change in the condition in which it was manufactured and sold.

17    82.    BEXTRA® was unsafe for normal or reasonably anticipated use.

18    83.    BEXTRA® was defective in design or formulation because when it left the
19  hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous
20  than an ordinary consumer would expect. BEXTRA® was also defective and unreasonably
21  dangerous in that the foreseeable risk of injuries from BEXTRA® exceeded the benefits associated
22  with the design and/or formulation of the product.

23    84.    Bextra® is unreasonably dangerous: a) in construction or composition as
24  provided in R.S. 9:2800.55; b) in design as provided in R.S. 9:2800.56; c) because an adequate
25  warning about the product was not provided as required by R.S. 9:2800.57; d) because it does not
26  conform to an express warranty of the manufacturer about the product as provided in R.S.
27  9:2800.58.

28

- 17 -

1     85.    The characteristics of Bextra® that render it unreasonably dangerous under
2  R.S. 9:2800.55, et seq., existed at the time the product left the control of the manufacturer or
3  resulted from a reasonably anticipated alteration or modification of the product.

4     86.    The BEXTRA® manufactured and supplied by Defendants was also
5  defective due to inadequate warnings, and/or inadequate clinical trials, testing and study, and
6  inadequate reporting regarding the results of the clinical trials, testing and study. Defendants failed
7  to perform adequate testing before exposing Plaintiffs STEWART, KAELIN, SISTRUNK AND
8  YARBROUGH to the medication, testing which would have shown that BEXTRA® had the
9  potential to cause serious side effects including strokes like that which affected Plaintiffs
10  STEWART, KAELIN, SISTRUNK AND YARBROUGH.

11     87.    The BEXTRA® manufactured and supplied by Defendants was defective
12  due to inadequate post-marketing warnings or instructions because, after Defendants knew or
13  should have known of the risk of injuries from BEXTRA®, they failed to provide adequate
14  warnings to the medical community and the consumers, to whom they were directly marketing and
15  advertising BEXTRA®; and, further, it continued to affirmatively promote BEXTRA® as safe and
16  effective.

17     88.    BEXTRA® was manufactured, distributed, tested, sold, marketed,
18  advertised and promoted defectively by Defendants, and as a direct and proximate cause of
19  Defendants' defective design of BEXTRA®, Plaintiff's STEWART, KAELIN, SISTRUNK AND
20  YARBROUGH used BEXTRA® rather than other safer and cheaper NSAIDs.  As a result,
21  Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH suffered the personal injuries
22  described above.

23     89.    Information given by Defendants to the medical community and to the
24  consumers concerning the safety and efficacy of BEXTRA®, especially the information contained
25  in the advertising and promotional material, did not accurately reflect the potential side effects of
26  BEXTRA®.

27

28

- 18 -

1        90.    Had adequate warnings and instructions been provided, Plaintiffs

2  STEWART, KAELIN, SISTRUNK AND YARBROUGH would not have taken BEXTRA® as he

3  did, and would not have been at risk of the harmful side effects described herein.

4        91.    Defendants acted with conscious and deliberate disregard of the foreseeable

5  harm caused by BEXTRA®.

6        92.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH could

7  not, through the exercise of reasonable care, have discovered BEXTRA®'s defects or perceived

8  the dangers posed by the drug.

9        93.    As a direct and proximate consequence of Defendants' acts, omissions, and

10  misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services

11  and endured mental pain and suffering and loss of consortium of STEWART, KAELIN,

12  SISTRUNK AND YARBROUGH. The losses are permanent and continuing in nature. Plaintiffs

13  STEWART, KAELIN, SISTRUNK AND YARBROUGH sustained serious cardiovascular

14  injuries. Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH required healthcare

15  and services incurring direct medical losses and costs including care for hospitalization, physician

16  care, monitoring, treatment, medications, and supplies.

17        94.    Defendants' conduct was committed with knowing, conscious, wanton,

18  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,

19  including Plaintiff's STEWART, KAELIN, SISTRUNK AND YARBROUGH, thereby entitling

20  Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from

21  similar conduct in the future.

22        95.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

23  compensatory damages, and punitive and exemplary damages together with interest, the costs of

24  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

25

26

**THIRD CLAIM FOR RELIEF:**
**Breach of Express Warranty**

27        96.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as

28  if fully set forth herein.

1    97.    Defendants expressly represented to Plaintiffs STEWART, KAELIN,
2  SISTRUNK AND YARBROUGH and other consumers and the medical community that
3  BEXTRA® was safe and fit for its intended purposes, that it was of merchantable quality, that it
4  did not produce any dangerous side effects, particularly any unwarned-of side effects, and that it
5  was adequately tested.

6    98.    These warranties came in the form of:

7          a.    Defendants' public written and verbal assurances of the safety and
8  efficacy of BEXTRA®;

9          b.    Press releases, interviews and dissemination via the media of
10  promotional information, the sole purpose of which was to create an increased demand for
11  BEXTRA®, which failed to warn of the risk of injuries inherent to the ingestion of BEXTRA®,
12  especially to the long-term ingestion of BEXTRA®;

13          c.    Verbal and written assurances made by Defendants regarding
14  BEXTRA® and downplaying the risk of injuries associated with the drug;

15          d.    False and misleading written information, supplied by Defendants,
16  and published in the Physician's Desk Reference on an annual basis, upon which physicians
17  relied in prescribing BEXTRA® during the period of Plaintiffs STEWART, KAELIN,
18  SISTRUNK AND YARBROUGH ingestion of BEXTRA®, and;

19          e.    Advertisements.

20    99.    The documents referred to above were created by and at the direction of
21  Defendants.

22    100.    Defendants knew or had reason to know that BEXTRA® did not conform to
23  these express representations in that BEXTRA® is neither as safe nor as effective as represented,
24  and that BEXTRA® produces serious adverse side effects.

25    101.    BEXTRA® did not and does not conform to Defendants' express
26  representations because it is not safe, has numerous and serious side effects, including unwarned-of
27  side effects, and causes severe and permanent injuries.

28

- 20 -

1    102.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH, other
2  consumers, and the medical community relied upon Defendants' express warranties.

3    103.    As a direct and proximate consequence of Defendants' acts, omissions, and
4  misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
5  and endured mental pain and suffering and loss of consortium of her husband.  The losses are
6  permanent and continuing in nature.    Plaintiffs STEWART, KAELIN, SISTRUNK AND
7  YARBROUGH sustained serious cardiovascular injuries.    Plaintiffs STEWART, KAELIN,
8  SISTRUNK AND YARBROUGH required healthcare and services incurring direct medical losses
9  and costs including care for hospitalization, physician care, monitoring, treatment, medications,
10  and supplies.

11    104.    Defendants' conduct was committed with knowing, conscious, wanton,
12  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
13  including Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH, thereby entitling
14  Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from
15  similar conduct in the future.

16    105.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
17  compensatory damages, and punitive and exemplary damages together with interest, the costs of
18  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

19
20  ### FOURTH CLAIM FOR RELIEF:
### Breach of Implied Warranty

21    106.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as
22  if fully set forth herein.

23    107.    Defendants manufactured, distributed, advertised, promoted, and sold
24  BEXTRA®.

25    108.    At all relevant times, Defendants knew of the use for which BEXTRA® was
26  intended and impliedly warranted the product to be of merchantable quality and safe and fit for
27  such use.

28

- 21 -

1    109.    Defendants were aware that consumers, including Plaintiff MELVIN
2  DAVIS would use BEXTRA® for treatment of pain and inflammation and for other purposes.

3    110.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH and the
4  medical community reasonably relied upon Defendants' judgment and expertise to only sell them
5  or allow them to prescribe BEXTRA® only if it was indeed of merchantable quality and safe and
6  fit for its intended use.  Consumers, including Plaintiffs STEWART, KAELIN, SISTRUNK AND
7  YARBROUGH, and the medical community, reasonably relied upon Defendants' implied
8  warranty for BEXTRA®.

9    111.    BEXTRA® reached consumers, including Plaintiffs STEWART, KAELIN,
10  SISTRUNK AND YARBROUGH without substantial change in the condition in which it was
11  manufactured and sold by Defendants.

12    112.    Defendants breached their implied warranty to consumers, including
13  Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH; BEXTRA® was not of
14  merchantable quality or safe and fit for its intended use.

15    113.    As a direct and proximate consequence of Defendants' acts, omissions, and
16  misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
17  and endured mental pain and suffering and loss of consortium of her husband.  The losses are
18  permanent and continuing in nature.    Plaintiffs STEWART, KAELIN, SISTRUNK AND
19  YARBROUGH sustained serious cardiovascular injuries.    Plaintiffs STEWART, KAELIN,
20  SISTRUNK AND YARBROUGH required healthcare and services incurring direct medical losses
21  and costs including care for hospitalization, physician care, monitoring, treatment, medications,
22  and supplies.

23    114.    Defendants' conduct was committed with knowing, conscious, wanton,
24  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
25  including Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH, thereby entitling
26  Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from
27  similar conduct in the future.

28

- 22 -

1    115.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

2    compensatory damages and punitive and exemplary damages together with interest, the costs of

3    suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

4

5

**FIFTH CLAIM FOR RELIEF:**
**Fraudulent Misrepresentation & Concealment**

6    116.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as

7    if fully set forth herein.

8    117.    Defendants' superior knowledge and expertise, their relationship of trust and

9    confidence with doctors and the public, their specific knowledge regarding the risks and dangers of

10    BEXTRA®, and their intentional dissemination of promotional and marketing information about

11    BEXTRA® for the purpose of maximizing its sales, each gave rise to the affirmative duty to

12    meaningfully disclose and provide all material information about BEXTRA®'s risks and harms to

13    doctors and consumers.

14    118.    Defendants made fraudulent affirmative misrepresentations with respect to

15    BEXTRA® in the following particulars:

16    f.    Defendants    represented    through    their    labeling,    advertising,

17    marketing materials, detail persons, seminar presentations, publications, notice letters, and

18    regulatory submissions that BEXTRA® had been tested and found to be safe and effective for the

19    treatment of pain and inflammation; and

20    g.    Defendants represented that BEXTRA® was safer than other

21    alternative medications.

22    119.    Defendants    made    affirmative    misrepresentations;    and    fraudulently,

23    intentionally and/or recklessly concealed material adverse information regarding the safety and

24    effectiveness of BEXTRA®.

25    120.    Defendants made these misrepresentations and actively concealed adverse

26    information at a time when Defendants knew or had reason to know that BEXTRA® had defects

27    and was unreasonably dangerous and was not what Defendants had represented to the medical

28

- 23 -

1  community, the FDA and the consuming public, including Plaintiffs STEWART, KAELIN,
2  SISTRUNK AND YARBROUGH.

3       121.   Defendants omitted, suppressed and/or concealed material facts concerning
4  the dangers and risk of injuries associated with the use of BEXTRA® including, but not limited to,
5  the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'
6  purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the
7  serious nature of the risks associated with the use of BEXTRA® in order to increase its sales.

8       122.   The representations and concealment were undertaken by Defendants with
9  an intent that doctors and patients, including Plaintiffs STEWART, KAELIN, SISTRUNK AND
10  YARBROUGH, rely upon them.

11       123.   Defendants' representations and concealments were undertaken with the
12  intent of defrauding and deceiving Plaintiffs STEWART, KAELIN, SISTRUNK AND
13  YARBROUGH, other consumers, and the medical community to induce and encourage the sale of
14  BEXTRA®.

15       124.   Defendants' fraudulent representations evinced their callous, reckless,
16  willful, and depraved indifference to the health, safety, and welfare of consumers, including
17  Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH.

18       125.   Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH
19  physician and Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH relied on and
20  were induced by Defendants' misrepresentations, omissions, and/or active concealment of the
21  dangers of BEXTRA® in selecting BEXTRA® treatment.

22       126.   Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH and the
23  treating medical community did not know that the representations were false and were justified in
24  relying upon Defendants' representations.

25       127.   Had Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH
26  been aware of the increased risk of side effects associated with BEXTRA® and the relative
27  efficacy of BEXTRA® compared with other readily available medications, Plaintiffs STEWART,
28  KAELIN, SISTRUNK AND YARBROUGH would not have taken BEXTRA® as he did.

- 24 -

1      128.    As a direct and proximate consequence of Defendants' acts, omissions, and
2  misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
3  and endured mental pain and suffering and loss of consortium of her husband.  The losses are
4  permanent and continuing in nature.    Plaintiffs STEWART, KAELIN, SISTRUNK AND
5  YARBROUGH sustained serious cardiovascular injuries.    Plaintiffs STEWART, KAELIN,
6  SISTRUNK AND YARBROUGH required healthcare and services incurring direct medical losses
7  and costs including care for hospitalization, physician care, monitoring, treatment, medications,
8  and supplies.

9      129.    Defendants' conduct was committed with knowing, conscious, wanton,
10  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
11  including Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH, thereby entitling
12  Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from
13  similar conduct in the future.

14      130.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
15  compensatory damages, and punitive and exemplary damages together with interest, the costs of
16  suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

17
18                          **SIXTH CLAIM FOR RELIEF**
                             **(Unjust Enrichment)**

19      131.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint
20  as if fully set forth herein.

21      132.    At all times relevant to this action, Defendants were the manufacturers,
22  sellers, and/or suppliers of BEXTRA®.

23      133.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH paid for
24  BEXTRA® for the purpose of managing his pain safely and effectively.

25      134.    Defendants have accepted payment from Plaintiffs STEWART, KAELIN,
26  SISTRUNK AND YARBROUGH for the purchase of BEXTRA®.

27      135.    Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH did not
28  receive the safe and effective pharmaceutical product for which he paid.

                                    - 25 -

1         136.   It is inequitable and unjust for Defendants to retain this money because the

2 Plaintiffs STEWART, KAELIN, SISTRUNK AND YARBROUGH did not in fact receive the

3 product Defendant represented BEXTRA® to be.

4         137.   WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

5 equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court

6 deems just and proper.

7

8                                        **PRAYER FOR RELIEF**

9         WHEREFORE, Plaintiffs request the following relief:

10     138.   General damages in excess of the jurisdictional amount of this Court;

11     139.   Consequential damages;

12     140.   Disgorgement of profits;

13     141.   Restitution;

14     142.   Punitive and exemplary damages;

15     143.   Pre-judgment and post-judgment interest as provided by law;

16     144.   Recovery of Plaintiffs STEWART, KAELIN, SISTRUNK AND

17 YARBROUGH's costs including, but not limited to, discretionary Court costs of these causes, and

18 those costs available under the law, as well as expert fees and attorneys' fees and expenses, and

19 costs of this action; and

20     145.   Such other and further relief as the Court deems just and proper.

- 26 -

DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable in this action.

Respectfully submitted,
THE WHITEHEAD LAW FIRM, L.L.C.

By: 
C. Mark Whitehead, III
Bar No. 27682
cmw@whitehead.com
Post Office Box 81007
Lafayette, LA 70598
337 740-6006 Telephone
337 740-6002 Facsimile

Attorneys for Plaintiffs

- 27 -